**\*\*E-filed 6/28/11\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ROBYN COHEN, et al.,

    Plaintiffs,

v.

FACEBOOK, INC.,

    Defendant.

No. C 10-5282 RS

**ORDER GRANTING MOTION TO DISMISS**

## I. INTRODUCTION

In a few short years, Facebook has emerged as a platform on which individuals can disseminate vast amounts of information, ranging from trivial details of daily personal life to breaking developments in international newsmaking events. As a "social networking" internet site, Facebook exists because its users *want* to share information—often about themselves—and to obtain information about others, within and among groups and subgroups of persons they already know or with whom they become acquainted through using Facebook. During Facebook's growth, however, it has from time to time introduced new features ostensibly designed to facilitate its users' abilities to share and obtain information that have provoked objections from some that the system is distributing too much information automatically, without users' consent or intent, and to the detriment of personal privacy interests. This putative class action arises from Facebook's implementation of such a feature, known as "Friend Finder."

Friend Finder is a service that a Facebook user can choose to employ by giving the system access to email accounts the user may have on other services. The system then searches the contact information in those accounts, compares it to the Facebook user database, and presents the user with a list of other Facebook users he or she already knows, but who are not among his or her Facebook "friends." The system also generates emails to the user's email contacts who are not Facebook members, inviting them to join. With this much of Friend Finder's functions, plaintiffs have no quarrel.

Facebook , however, promotes the availability of the Friend Finder service by periodically placing notifications on the "home" pages of users' accounts, stating that certain of their Facebook "friends" have utilized the service to locate persons they know, and encouraging the users to "[g]ive it a try!" The notices include the names and profile pictures of the "friends" who have purportedly used the service. Plaintiffs contend Facebook thereby has used their names and profile pictures to promote the Friend Finder service without their knowledge or consent, and, at least in the case of some of them, despite the fact that they have not actually ever used the service. Because profile pictures often are photographs that users upload of themselves (although there is no requirement that they be), plaintiffs contend Facebook has thereby misappropriated both their names and likenesses for its own commercial purposes, and that such conduct is actionable under a variety of common law and statutory theories.

Facebook moves to dismiss, making two primary arguments. First, Facebook contends that it is perfectly within its rights under the agreements that govern use of its site to engage in the conduct alleged. Second, Facebook argues that plaintiffs have not alleged any cognizable injury from the alleged practices, because their names and profile pictures were merely displayed to their Facebook "friends," who already had access to them, and because they have no commercial interests in their names and likenesses. While Facebook's position that it has the unequivocal legal right to use the plaintiffs' names and profile pictures in the manner alleged is not determinative (at least at the pleading stage), it fares better with its argument that plaintiffs have not adequately alleged facts showing injury. Accordingly, the motion to dismiss will be granted, with leave to amend.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 US 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Claims grounded in fraud are also subject to Rule 9(b), which provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 US at 570). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 US at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true).[1]

### III. DISCUSSION

---

[1] Quoting a maxim that originated in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), plaintiffs argue that their complaint is not subject to dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In *Twombly*, however, the Supreme Court concluded that this "famous observation" from *Conley*, "has earned its retirement" and is "best forgotten." *Twombly*, 550 U.S. at 563.

3

A. <u>Misappropriation</u>

Plaintiffs assert one count under the common law for misappropriation of their names and likenesses, and one count under California Civil Code §3344, which complements, but "neither replaces nor codifies the common law cause of action." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998); s*ee also Eastwood v. Superior Court*, 149 Cal.App.3d 409, 416-417 n.6 (1983). To state a claim for common law misappropriation, plaintiffs must allege "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Newcombe*, 157 F.3d at 692 (9th Cir. 1998). For a claim under Civil Code §3344, plaintiffs must additionally allege "(1) a 'knowing' use; (2) for purposes of advertising, and (3) a direct connection between the use and the commercial purpose." *Id.* As to both claims, Facebook's motion to dismiss challenges the adequacy of plaintiffs' pleading as to the elements of consent, defendant's "advantage," and, injury.

1. *Consent*

Plaintiffs have expressly alleged that their names and profile pictures were used without consent in Facebook's promotions for the Friend Finder service. To support its argument that those allegations may be disregarded, Facebook relies on its "Statement of Rights and Responsibilities," "Principles," and "Privacy Policy" (collectively "the Terms documents"). All of these documents are at least arguably referenced in the complaint, which mentions Facebook's "terms" and privacy controls, and expressly quotes from the Principles.

Ordinarily, a motion to dismiss under Rule 12(b)(6) must be evaluated solely on the face of the complaint, documents incorporated into the complaint by reference, and any relevant matters of which judicial notice may be properly taken. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Here, Facebook contends that consideration of the Terms documents is appropriate either because "as a general matter, websites and their contents may be proper subjects for judicial notice" or because some authorities have extended the concept of "incorporated by reference" to include documents "the authenticity of which [are] not contested, and upon which the plaintiff's complaint necessarily relies," regardless of the extent they are mentioned in the complaint

at all. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998). The theory behind this rule is the policy concern of "[p]reventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Id.*

It is far from clear that it would be proper to rely on the Terms documents to dismiss plaintiffs' claims at this juncture. Even assuming it is permissible to take judicial notice of the contents of websites under some circumstances and for some purposes, substantial questions would remain in this instance as to when various versions of the documents may have appeared on the website and the extent to which they necessarily bound all plaintiffs. Additionally, it does not appear that plaintiffs' claims "necessarily rely" on the existence of the Terms documents in the sense contemplated by *Parrino* and similar cases.

Ultimately, however, it is not necessary to decide whether it would theoretically be possible to apply the Terms documents against plaintiffs at the motion to dismiss stage, because even assuming the provisions of those existed in substantially similar form at all relevant times and are legally binding on all the plaintiffs, Facebook has not shown that those terms are sufficient to insulate it from plaintiffs' claims. Facebook relies primarily on a section of the Statement of Rights and Responsibilities entitled "Sharing Your Content and Information," that states:

> For content that is covered by intellectual property rights, like photos and videos ('IP content'), you specifically give us the following permission, subject to your privacy and application settings: you grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook ("IP License").

Secondarily, Facebook points to provisions of the Privacy Policy stating, "your name and profile picture do not have privacy settings. If you are uncomfortable with sharing your profile picture, you should delete it (or not add one)" and "We use the information we collect to provide our services and features to you . . . ."

Facebook contends that the quoted provision of the Statement of Rights and Responsibilities, standing alone, "unambiguously gives Facebook the right to use any photos, including Plaintiffs' profile photos, in any manner on Facebook, subject to Users' privacy and application settings."

5

This interpretation of the "unambiguous" effect of the provision is curious, as it simultaneously inserts a limitation (uses "on Facebook") and an explication ("in any manner"), neither of which are apparent in the plain words of the text. A more natural reading of the provision is that it gives Facebook a worldwide license to reproduce any pictures or text posted by a user, subject to any privacy settings, that would insulate it from any *copyright* claims by the user, whether or not the reproduction was made "on Facebook." Although the term "use" is not defined, it does not necessarily follow that the result should be that *any* use is permissible, rather than a conclusion that the provision is ambiguous, at best. Of course, regardless of what rights this provision may give Facebook to use profile pictures posted by its users, it does not even purport to give it rights to use their names.

Were plaintiffs claiming that Facebook had violated their rights merely by "sharing" their names and/or profile pictures, the provision of the Statement of Rights and Responsibilities and/ or the provisions of the Privacy Policy that Facebook cites might be dispositive. The gravamen of the claims, though, is not that the names and pictures were displayed, but that Facebook did so in a way that constituted (1) an express representation that plaintiffs had utilized the Friend Finder service, and (2) at least arguably, an implied *endorsement* by plaintiffs of that service.[2] Nothing in the provisions of the Terms documents to which Facebook has pointed constitutes a clear consent by users to have their name or profile picture shared in a manner that discloses what services on

---

[2] It does not seem likely that Facebook intentionally designed the Friend Finder promotion system to display the names and profile pictures of users who had not actually utilized the service. It may be, as Facebook suggests, that at the point in time when some users became aware their names and profile pictures were showing up on the home pages of their friends, they did not remember or realize that they used the service at some earlier point in time, perhaps when they first signed up on Facebook. Or, perhaps some programming error by Facebook caused the problem. In any event, the allegation that the names and profile pictures of at least some persons were used who never utilized the Friend Finder service is not so implausible as to permit it to be disregarded on a motion to dismiss. With respect to such persons, therefore, there is the additional issue that they are effectively alleging that Facebook *falsely* represented that they used the service. Prior to filing any amended complaint, plaintiffs' counsel should ensure that there is an adequate basis to make such a claim and that it is not an issue of faulty memory.

Facebook they have utilized, or to endorse those services.[3] The only provision Facebook cites that expressly discusses how collected "information" will be employed advises the user that, "We use the information we collect to provide our services and features to you . . . ." (Emphasis added.) Posting the name and profile picture of a user who has accessed the Friend Finder service on the home page of *other* users to encourage them to utilize the service does not clearly fall within the meaning of this disclosure.

Facebook is correct that the Terms documents make clear that users have no expectation of complete privacy in their names or profile pictures *per se*, but that is merely consistent with common law and statutory misappropriation law, neither of which protect against *disclosure* of a person's name or identity, but against particular *uses* thereof.[4] Presumably Facebook would not argue that its supposed license to use profile pictures "in any manner" would insulate it from defamation claims were it to post the names and pictures of the named plaintiffs on every user's Facebook home page, over a caption reading, "The FBI's Most Wanted." Although plaintiffs are not bringing a defamation claim *per se*, the interests that misappropriation law seeks to protect are as much akin to those protected under defamation law as they are to the "intellectual property" rights addressed by Facebook's Statement of Rights and Responsibilities. Plaintiffs may indeed have consented to the disclosure of their names and profile pictures to their Facebook friends and even to Facebook users at large, but Facebook has not established that they consented to the particular uses in dispute here.

---

[3] It may be that information regarding a user's activities on Facebook is routinely shared with the user's friends, but it appears that in most other instances a user can apply privacy settings to limit how widely such information is shared, or whether it is shared at all.

[4] *See generally Eastwood*, *supra*, 149 Cal.App.3d at 416 (explaining that the right of "privacy" encompasses "four distinct torts," namely, "(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness.") Here, plaintiffs' claims fall under the fourth category.

7

2. *Defendants' "advantage"*

The averments of the complaint show that the Friend Finder service is designed to encourage Facebook users to create larger networks of "friends," and, at least allegedly, to give Facebook access to email addresses for non-users who can then be solicited to join Facebook. As such, the service facilitates Facebook's ability to increase both its user base and the amount of time individual users spend on the site. While Facebook does not charge its members any fees to join or use the site, it is beyond dispute that its ability to earn advertising revenues and its valuation as a company are dependent on the size and involvement of its user base. In any ordinary sense, therefore, the alleged misappropriation of plaintiffs' names and likenesses to promote the Friend Finder service was undertaken for Facebook's "advantage."

Facebook, however, relies on *Newcombe v. Adolf Coors Co.*, 157 F.3d 686 (9th Cir. 1998), to argue that it does not receive a "direct" benefit sufficient to constitute an "advantage" within the meaning of the law. In *Newcombe*, a magazine publisher was found not liable for misappropriation in connection with its publication of a beer advertisement that allegedly contained the unauthorized likeness of the plaintiff. The court observed that "the benefit [the publisher] received—payment for the advertising space—was unrelated to the contents of the advertisement." *Id.* at 693. Facebook's attempt to analogize its position to that of the magazine publisher might be apt if plaintiffs were claiming that their names and likenesses had been used in third-party advertising on the Facebook site. Here, however, Facebook is more nearly in the position of the beer company that placed the advertisement in *Newcombe*, who the court found *was* potentially liable for misappropriation. *See id.* Accordingly, Facebook has not shown that the complaint insufficiently alleges "appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise."

3. *Injury*

"Resulting injury is the *sine qua non* of a cause of action for misappropriation of name." *Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799, 807 (1990). Here, plaintiffs' sole allegation relating to injury is the conclusory assertion, repeated at least twice in the complaint, that they "have suffered injury-in-fact by having their name[s] and likeness[es] misappropriated without

8

1 their knowledge or consent." Plaintiffs have not even alleged that they suffered "injury to [their]
2 feelings," which *Slivinsky* notes is "gist" of a misappropriation claim. *Id.* Moreover, even if
3 plaintiffs had included a conclusory assertion of "hurt feelings," they have alleged no facts that
4 would suffice to show a plausible entitlement to relief. *See Iqbal*, 129 S.Ct. at 1950. Plaintiffs have
5 not shown how the mere disclosure to their Facebook friends that they have employed the Friend
6 Finder service (even assuming some of them did not) causes them any cognizable harm, regardless
7 of the extent to which that disclosure could also be seen as an implied endorsement by them of the
8 service.

9 Plaintiffs argue that at least their claim under Civil Code §3344 survives, because the statute
10 provides for minimum damages of $750 for misappropriation of a plaintiff's name or likeness.
11 Plaintiffs quote *Miller v. Collectors Universe, Inc.*, 159 Cal.App.4th 988 (2008), for the proposition
12 that "by enacting section 3344(a), the Legislature provided a practical remedy for a non-celebrity
13 plaintiff whose damages are difficult to prove and who suffers primarily mental harm from the
14 commercial misappropriation of his or her name." *Id.* at 1002. Nothing in *Miller* or the statute,
15 however, suggests that a plaintiff is entitled to the minimum damages award even in the absence of
16 showing any harm. To the contrary, *Miller* states that "statutory minimum damages were meant to
17 compensate non-celebrity plaintiffs *who suffer . . . . mental anguish* yet no discernible commercial
18 loss." *Id.* at 1006 (emphasis added). Accordingly, plaintiffs must, at a minimum, plead that they
19 suffered mental anguish as a result of the alleged misappropriation, and a plausible supporting
20 factual basis for any such assertion. The misappropriation claims must therefore be dismissed, with
21 leave to amend.

23 B. <u>Lanham Act</u>
24 The complaint asserts a claim under a provision of the Lanham Act that creates civil liability
25 for the use in commerce of "any word, term, name . . . or false or misleading representation of fact,
26 which is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin,
27 sponsorship, or approval of [one person's] goods, services, or commercial activities by another
28 person." 15 U.S.C. § 1125(a)(1). Facebook's challenge to this "false association" or "false

United States District Court
For the Northern District of California

9

endorsement" claim is related, but not identical, to its argument that plaintiffs have failed to allege injury sufficient to support the misappropriation claims. The Lanham Act is intended "to regulate commerce" and "to protect persons engaged in such commerce against unfair competition." 15 U.S.C. § 1127. As such, plaintiffs pursuing a false association or false endorsement claim must be able to allege some "commercial interest" in their names and likenesses that was injured by Defendant's actions. *See Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992) (holding that while standing to bring a Lanham Act false endorsement claim does not require a plaintiff to be in "actual competition" with the defendant, the plaintiff must have "an economic interest akin to that of a trademark holder in controlling the commercial exploitation of his or her identity.") As the *Waits* court observed, absent such limitations tying actionable misconduct to the protection of commercial interests and competition, "the Lanham Act would become a federal statute creating the tort of misrepresentation." *Id.* at 1108.

Plaintiffs argue that the Lanham Act extends protection to persons who may not be "celebrities," or well-known to the public at large. While there may be circumstances in which a plaintiff's reputation among an identifiable group would create a protectable economic interest in his or her identity, plaintiffs' suggestion that they have such an interest here merely because they are known to their own Facebook friends does not rise to the level necessary to invoke the Lanham Act's protection for identities that are "akin to a trademark." Accordingly, the Lanham Act claim must be dismissed for failure to allege sufficient facts to support plaintiffs' standing. Although it is not clear how this defect could be cured through amendment, plaintiffs will be given leave to amend, in the event they in good faith can allege additional facts to show they hold interests in their names and identities within the scope of the Lanham Act's protections.

C.  Unfair Competition

Plaintiffs' claim that Facebook's alleged conduct violated California Business and Professions Code §17200 as an "unlawful" or "unfair" practice is derivative of, and dependent on the viability of their other claims. For substantially the same reasons discussed above, the claim therefore fails. Apart from arguing that they have in fact adequately pleaded injury and predicate

10

acts of unlawful and unfair conduct, plaintiffs' opposition brief contends that under the California Supreme Court's recent decision in *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310 (2011), they need not necessarily have suffered a loss of money or property to have standing under §17200. *Kwikset* in fact reaffirms the *contrary* proposition, that standing under the statute *is* limited to persons who have "lost money or property" and that the standard is therefore *more* restrictive than the Constitutional standing requirement of "injury in fact." 51 Cal.4th at 323-324. The only new ground broken by *Kwikset* is its conclusion that a plaintiff who has lost money or property, but who for some other reason may not be entitled to *restitution*, is not deprived of standing under §17200 to seek injunctive relief. *See id.* at 336.

Accordingly, plaintiff's claim under §17200 is dismissed. In light of the requirement to show a loss of money or property, it is not clear that plaintiffs necessarily will be able to allege a basis for standing under this claim even if they succeed in alleging "injury in fact" sufficient to support the misappropriation claims. Nevertheless, they will be given leave to amend in the event they have a good faith basis to do so.

## IV. CONCLUSION

The motion to dismiss is granted, with leave to amend. Any amended complaint shall be filed within 20 days of the date of this order.

IT IS SO ORDERED.

Dated: 6/27/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE