SPILLANE WEINGARTEN LLP
Jay M. Spillane (Bar No. 126364)
jspillane@spillaneweingarten.com
Eric B. Carlson (Bar No. 193401)
ecarlson@spillaneweingarten.com
1100 Glendon Avenue, Suite 1200
Los Angeles, California 90024
(310) 229-9300
(310) 229-9380 (fax)

INITIATIVE LEGAL GROUP APC
Marc Primo (Bar No. 216796)
mprimo@initiativelegal.com
Raul Perez (Bar No. 174687)
rperez@initiativelegal.com
Robert Byrnes (Bar No. 200761)
rbyrnes@initiativelegal.com
1800 Century Park East, 2nd Floor
Los Angeles, CA 90067
(310) 556-5637
(310) 861-9051 (fax)

Attorneys for Plaintiffs and Class Members

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBYN COHEN, SHANNON STOLLER, CHRISTOPHER MARSHALL, BRYAN SIGLOCK, and DEBRA LEWIN, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., a Delaware corporation, <br><br> Defendant. | Case No. 3:10 CV 05282 RS <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **Filed Concurrently: Request for Judicial Notice; Compendium of Certain Authorities** <br><br> Date: September 15, 2011 <br> Time: 1:30 p.m. <br> Courtroom: 3 <br> Judge: Hon. Richard Seeborg <br> Trial Date: TBD |

# TABLE OF CONTENTS

KEY AVERMENTS OF FAC AND SUMMARY OF OPPOSITION ................................... 1

ISSUES TO BE DECIDED ................................................................................ 4

ARGUMENT .................................................................................................. 4

   I. WHERE A PLAINTIFF PLEADS THAT S/HE WAS DIRECTLY AFFECTED BY
      VIOLATION OF A RIGHT RECOGNIZED BY THE COURTS OR
      LEGISLATURES, EVEN RIGHTS SOUNDING IN MISAPPROPRIATION OF
      PERSONAL INFORMATION, DISMISSAL FOR SUPPOSED LACK OF
      ARTICLE III STANDING OR INJURY-IN-FACT IS NOT WARRANTED. ........... 4

      A. Examples Abound Where Courts and Congress Have Recognized a Plaintiff's
         Standing to Seek Court Redress for Misuse of "Personal Information" or Invasion
         of "Privacy" Rights. ............................................................................. 5

      B. Averments Sufficient to Demonstrate Violation of Established Legal Rights by
         the Person Affected Thereby Confer Standing; Facebook Has Cited No Authority
         Where a Violation of Law Was Alleged by the Person Affected Thereby, and Yet
         Where the Claim was Dismissed on Article III Standing Grounds. ...................... 8

   II. PLAINTIFFS HAVE PROPERLY PLED CLAIMS FOR VIOLATIONS OF THEIR
       STATUTORY AND COMMON LAW RIGHTS OF PUBLICITY. ........................... 9

      A. The Tort in Question, Originally Conceived as a Violation of the Multi-Faceted
         Right of "Privacy," Also Came to be Known as the Right of "Publicity,"
         Resulting in Economic Loss. ................................................................... 9

      B. The "Right of Publicity," Invasion of which Results in Economic Loss, is
         Available to All, not Merely to "Celebrities," Even Absent any Averment of
         Mental Anguish. ................................................................................. 11

      C. *Miller* Did not Hold that Non-celebrity Right of Publicity Plaintiffs May Obtain
         Standing Only by Averring Mental Anguish; its Musings Were *Dicta,* Based
         Upon Misreading of the Legislative History and Were Rendered Without Analysis
         or Even Mention of the Authorities Cited Herein. ................................................ 18

      D. The Right of Publicity Law Imposes no Requirements that Plaintiffs Plead
         Secondary Meaning or the Objectively Offensive Nature of the Claimed Conduct.
         ............................................................................................... 21

   III. PLAINTIFS HAVE ADEQUATELY PLED THE STANDING REQUIREMENTS
       FOR UCL CLAIMS, AS WELL AS UNDERLYING UNLAWFUL AND UNFAIR
       CONDUCT. ........................................................................................ 22

i

A. Plaintiffs Have Adequately Pled Facts Meeting the Standing Requirements of the UCL................................................................................................................... 22

B. Plaintiffs Have Adequately Pled Unlawful Conduct Consisting of Violation of Common Law and Statutory Rights of Publicity.................................................. 23

C. Plaintiffs Have Adequately Pled Conduct, Both "Unlawful" and "Unfair," Consisting of Deceptive Trade Practices. ............................................................ 23

CONCLUSION................................................................................................................ 25

Plaintiffs' Opposition to Facebook's Motion to Dismiss FAC – 3:10 CV 05282 RS

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>CASES</u>

*Ainsworth v. Century Supply Co.*,
    295 Ill.App.3d 644, 693 N.E.2d 510 (2d Dist. 1998) ........................................................16, 17

*Alberghetti v. Corbis Corp.*,
    263 F.R.D. 571 (C.D. Cal. 2010) ...............................................................................13, 16

*Archer v. United Rentals, Inc.*,
    195 Cal.App.4th 807, 126 Cal.Rptr.3d 118 (2011)..................................................................7

*Bowling v. Missionary Servants of Most Holy Trinity*,
    972 F.2d 346, 20 Media L. Rep. (BNA) 1496 (6th Cir. 1992) .................................................16

*Brecher v. Citigroup Global Markets, Inc.*,
    2011 WL 3475299 (S.D. Cal. 2011) .................................................................................23

*Canessa v. J.I. Kislak, Inc.*,
    97 N.J. Super. 327, 235 A.2d 62 (Law Div. 1967) ...........................................................17, 12

*Carey v. Population Services, Int'l*,
    431 U.S. 678, 97 S.Ct. 2010 (1977)..................................................................................5

*Christoff v. Nestle USA, Inc.*,
    47 Cal. 4th 468, 97 Cal.Rptr.3d 798 (2007).............................................................13, 16, 20

*Citizens for Health v. Leavitt*,
    428 F.3d 167 (3d Cir. 2005).........................................................................................6

*Comedy III Productions, Inc. v. Saderup*,
    25 Cal.4th 387, 106 Cal.Rptr. 2d 126 (2001)..................................................................10, 11

*Del Amo v. Baccash*,
    2008 WL 4414514 (C.D. Cal. 2008)................................................................................13

*Doe 1 v. AOL, LLC*,
    719 F.Supp.2d 1102 (N.D. Cal. 2010) (Armstrong, J.)..............................................................6

*Dora v. Frontline Video, Inc.*,
    15 Cal.App.4th 536, 18 Cal.Rptr.2d 790 (1993)..............................................................12, 20

*Dwyer v. American Express Co.*,
    273 Ill.App.3d 742, 652 N.E.2d 1351 (1st Dist. 1995)..............................................................7

Plaintiffs' Opposition to Facebook's Motion to Dismiss FAC – 3:10 CV 05282 RS

*Edwards v. First Am. Corp.,*
  610 F.3d 514 (9th Cir. 2010), *cert. granted in part,* 2011 WL 2437037 (June 20,
  2011) ....................................................................................................................8

*Experience Hendrix, LLC v. Hendrixlicensing.com, Ltd.,*
  766 F. Supp.2d 1122 (W.D. Wash. 2011).........................................................16

*Fairfield v. American Photocopy Equipment Co.,*
  138 Cal.App.2d 82, 291 P.2d 194 (1955) ....................................................9, 20

*Fanelle v. Lojack,*
  2000 WL 1801270 (E.D. Pa. 2000) ...................................................................16

*Fields v. QSP,*
  2011 WL 1375286 (C.D. Cal. 2011)...................................................................23

*Fogelstrom v. Lamps Plus, Inc.,*
  195 Cal.App.4[th] 986, 125 Cal.Rptr.3d 260 (2011)............................................7

*Fulfillment Servs. v. UPS,*
  528 F.3d 614 (9th Cir 2008) ................................................................................8

*Gladstone Realtors v. Village of Bellwood,*
  441 U.S. 91, 99 S.Ct. 1601 (1979).......................................................................9

*Griswold v. Connecticut,*
  381 U.S. 479, 85 S.Ct. 1678 (1965).....................................................................5

*Haelen Laboratories, Inc. v. Topps Chewing Gum, Inc.,*
  202 F.2d 866 (2d Cir. 1953)...............................................................................10

*Hawaii Psychiatric Society v. Ariyoshi,*
  481 F.Supp. 1028 (D. Hawaii 1979).....................................................................5

*In the Matter of Google, Inc.,*
  2011 WL 1321658 (F.T.C. 2011) .......................................................................24

*In re Doubleclick Inc. Privacy Litig.,*
  154 F.Supp.2d 497 (S.D.N.Y. 2001)...............................................................7, 10

*In re Jet Blue Airways Corp. Privacy Litig.,*
  379 F.Supp.2d 299 (E.D.N.Y. 2005) ...................................................................7

*KNB Enterprises v. Matthews,*
  78 Cal.App.4th 362, 92 Cal.Rptr.2d 713 (2000)......................................12, 13, 20

*Krottner v. Starbucks Corp.,*
  628 F.3d 1139 (9th Cir. 2010) ...........................................................................6

*Kwikset Corp. v. Superior Court*,
   51 Cal.4th 310, 120 Cal.Rptr.3d 741 (2011)........................................................22

*L.A. Haven Hospice v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ...........................................................................8

*LaCourt v. Specific Media*,
   2011 WL 1661532 (C.D. Cal. 2011)...................................................................7

*Lee v. Chase Manhattan Bank*,
   2008 WL 698482 (N.D. Cal. 2008) ...................................................................9

*Linda R.S. v. Richard D.*,
   410 U.S. 614, 93 S.Ct. 1146 (1973)...................................................................8

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ...........................................................................24

*Lugosi v. Universal Pictures*,
   25 Cal.3d 813, 160 Cal.Rptr. 323 (1979)...........................................................10

*Mayfield v U.S.*,
   599 F.3d 964 (9th Cir. 2010) ...........................................................................6

*Melvin v. Reid*,
   112 Cal.App. 285, 297 P. 91 (1931) .................................................................9

*Miller v. Collectors Universe, Inc.*,
   159 Cal.App.4th 988, 72 Cal.Rptr.3d 194 (2008)........................................... passim

*Motschenbacher v. R.J. Reynolds Tobacco Co.*,
   498 F.2d 821 (9th Cir. 1974) ...................................................................11, 20

*Onassis v. Christian-Dior-New York, Inc.*,
   122 Misc.2d 603, 472 N.Y.S.2d 254 (N.Y. Sup. 1984).........................................16

*Raines v. Byrd*,
   521 U.S. 811, 117 S.Ct. 2312 (1997).................................................................9

*Robins v. Spokeo, Inc.*,
   2011 WL 597867 (C.D. Cal. 2011)....................................................................9

*Smith v. NBC Universal*,
   524 F.Supp.2d 315 (S.D.N.Y. 2007).................................................................13

*South Bay Chevrolet v. GM Acceptance Corp.*,
   72 Cal.App.4th 861, 85 Cal.Rptr.2d 301 (1999)..................................................24

v

*Starr-Gordon v. Massachusetts Mut. Life Ins. Co.*,
    2006 WL 3218778 (E.D. Cal. 2006)............................................................23

*Summers v. Earth Island Inst.*,
    555 U.S. 488, 129 S.Ct. 1142 (2009).........................................................9

*Tellado v. Time-Life Books, Inc.*,
    643 F.Supp. 904 (D.N.J. 1986) .................................................................17

*Territory of Alaska v. American Can Co.*,
    358 U.S. 224, 79 S.Ct. 274 276 (1959)....................................................19

*Thompson v. Home Depot, Inc.*,
    2007 WL 2746603 (S.D. Cal. 2007) ...........................................................7

*Waits v. Frito-Lay, Inc.*,
    978 F.2d 1093 (9th Cir. 1992) ................................................................21

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    433 U.S. 562, 97 S.Ct. 2849 (1977).....................................................11, 17

*Zitovsky ex rel. Ari Z. v. Secretary of State*,
    444 F.3d 614 (D.C. Cir. 2006) ...................................................................7

### STATUTES

California Business & Professional Code § 17204....................................22

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* .......................5

Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*...........5

Health Insurance Portability and Accountability Act of 1996, 29 U.S.C. § 1181 *et seq.*.............5

Health Insurance Portability and Accountability Act of 1996 ("HIPAA") ...............5, 6

Public Health Service Act, 42 U.S.C. § 201 *et seq.*..................................6

Federal Trade Commission Act. Section 5(a)  *15 U.S.C. § 45* ..................24

Stored Communications Act, 18 U.S.C. § 2701 *et seq.* .............................5

### JURY INSTRUCTIONS

Judicial Council of California Civil Jury Instructions 1800 .......................21

Judicial Council of California Civil Jury Instructions 1803 ..................14, 21

Judicial Council of California Civil Jury Instructions 1804 ........................................................18

Judicial Council of California Civil Jury Instructions 1804A .....................................................21

Judicial Council of California Civil Jury Instructions 1821 .............................................14, 18

## Other Authorities

Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39
    N.Y.U. L.Rev. 962, 985-991 (1964) ..................................................................................12

Kalven, *Privacy in Tort Law-Were Warren and Brandeis Wrong?*, 31 Law &
    Contemp.Prob. 326, 331 (1966)..............................................................................12, 17

L. Brandeis & C. Warren, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890) ..............................9

McCarthy, *The Rights of Publicity and Privacy* (West 2011) § 4:15 .........................................11

McCarthy, *The Rights of Publicity and Privacy* (West 2011) § 5:7 ...........................................21

Nimmer, *The Right of Publicity*, 19 Law & Contemp. Probs. 203 (1954) ..................................10

Restatement Third, Unfair Competition § 46, comment d (1995)................................................16

Wright Miller Cooper, "Federal Practice & Procedure" (West 3d ed. 2008) §§ 3531-
    3533.2.3...................................................................................................................................8

Plaintiffs' Opposition to Facebook's Motion to Dismiss FAC – 3:10 CV 05282 RS

**KEY AVERMENTS OF FAC AND SUMMARY OF OPPOSITION**

The Court's June 28, 2011 Order found that Facebook had not obtained consent for the contested uses of names and likenesses, and that Facebook had made the requisite commercial use, or taken adequate "advantage," of such uses. The key issue justifying dismissal with leave to amend was the Court's finding that plaintiffs should plead injury with greater specificity, and specifically injury in the form of "mental anguish," citing a single authority, *Miller v. Collectors Universe, Inc.*, 159 Cal.App.4th 988, 72 Cal.Rptr.3d 194 (2008).

Plaintiffs have studied the June 28, 2011 order and the applicable authority with great care. The law firmly supports a right of publicity claim by the "common man," not a celebrity, based upon injury to property, in other words economic injury, regardless of whether the plaintiff also pleads mental anguish. Plaintiffs have thus added numerous and specific averments in their First Amended Complaint ("FAC") that use of their names and likenesses to advertise is a property right, with at least minimal economic value, and that having used such names and likeness for advertising purposes, Facebook has invaded this right and deprived Plaintiffs of the opportunity to bargain for consent and obtain recompense for Facebook's use. See FAC ¶ 15 ("Section 3344 is violated by Facebook having knowingly employed users, including Plaintiffs', names, likenesses, and/or images to advertise, promote, and/or endorse  Facebook's services, but without having compensated the users for that use."); ¶ 16 ("Plaintiffs have suffered the loss of money or property by Facebook's failure to provide compensation for Facebook's employment of users' names, likenesses, and/or images"); ¶ 39 ("Plaintiffs did not consent to use of their names, photographs or likenesses in connection with Facebook's Friend Finder service.  Nor, moreover, have Plaintiffs been compensated in any fashion for the use of their names, photographs, and/or likenesses in connection with Facebook's promotion of its Friend Finder service"); ¶¶ 40-42.  In ¶ 43, Plaintiffs aver:

> "43.  Plaintiffs have a property interest in use of their names and likenesses, indeed rights that are, or have been compared to, intellectual property.  Plaintiffs' names

1
2
3
4
5

and likenesses may not be used by others without consent and payment.  Facebook used Plaintiffs names and likenesses to advertise its owner Friend Finder service, but without Plaintiffs' consent, effectively conscripting Plaintiffs to function as unpaid advertisers.  The very fact that Facebook selected a user's own friends as the names and likenesses to advertise Friend Finder to such user shows that the uses had value to Facebook, value that has not been shared by Facebook with the Plaintiffs.  Plaintiffs are entitled to reasonable compensation for Facebook's invasion of their rights of publicity."

6
7
8
9
10
11
12

See also FAC ¶ 58 (Section 3344 relief available to the "non-famous"); ¶ 59 (economic value of Plaintiffs' names and likenesses confirmed by Facebook's use); ¶ 60 (plaintiffs' names and likenesses were not available for advertising use without consent and compensation, and as a result of Facebook's conduct Plaintiffs have suffered economic injury consisting of the compensation Facebook should have paid); ¶ 61 (Facebook's misappropriation increased its user base and thus its advertising revenues); 62 (non-payment for use of Plaintiffs' names and likenesses).

13
14
15
16
17
18
19

The FAC also adds averments that Facebook has engaged in misleading trade practices.  The FAC specifically contrasts Facebook's lofty promises of ownership and control over personal information, together with statements that users would be able to control whether such information would be used in connection with advertisements of third parties, with Facebook's failure to disclose the misappropriation of names and likenesses in which it has engaged or to provide consumers with any ability to manipulate privacy settings to grant or deny permission to use of name or likeness to advertise.  FAC ¶¶ 77-83.

20
21
22
23
24

Facebook predictably has moved to dismiss the FAC for supposed failure to adhere literally to the terms of the June 28, 2011 order.  To the contrary, Plaintiffs have not ignored the order, but rather have concluded that overwhelming authority herein cited show that the FAC more than adequately states claims for relief based on economic loss, and that the motion to dismiss should be denied.

25
26
27
28

In Section I below, Plaintiffs demonstrate that where, as is the case here, a plaintiff pleads that they are the person affected by invasion of a primary right recognized by the courts or legislatures, particularly where a statutory remedy has been conferred, requirements of Article III standing and injury-in-fact are met.  Contrary to Facebook's

Plaintiffs' Opposition to Facebook's Motion to Dismiss FAC – 3:10 CV 05282 RS

argument that all claims sounding in privacy of information are unrecognized and too ephemeral to confer standing upon an aggrieved plaintiff, the law books abound with authorities rejecting Article III challenges to claims sounding in misappropriation of personal information. Notably, Facebook fails to cite a single case in which a right of publicity claim was dismissed for want of standing or injury. Facebook's inapposite cases raise standing concerns not present here, such as that the plaintiff has not been personally affected by the claimed violation, or that the alleged claim is not ripe or has become moot.

In Section II below, Plaintiffs demonstrate that they have adequately pled violation of their common law and statutory rights of publicity. The tort in question, originally conceived as an aspect of the multi-faceted law of "privacy," over time also became known as a "right of publicity," wherein name and likeness is seen as a form of property, misappropriation of which results in economic loss. This is a right of publicity case. The right of publicity is available to all, celebrity and non-celebrity alike, each of whom may plead economic loss, regardless of whether mental anguish is also alleged. The authorities supporting this conclusion are legion, some controlling. *Miller* did not hold that a non-celebrity plaintiff pleading only economic loss must suffer dismissal of his/her complaint. *Miller's* musings on the nature of the loss suffered by non-celebrities were *dicta*, and *Miller* misread the legislative history of Section 3344. Plaintiffs also demonstrate that Facebook implicitly and wrongly seeks to require Plaintiffs to prove elements non-existent in the right of publicity law, such as the secondary meaning of Plaintiffs' identity and that the conduct alleged be objectively unreasonable.

Finally, in Section III, Plaintiffs demonstrate that having adequately pled underlying claims for violation of Plaintiffs statutory and common law rights of publicity, and having thus shown "injury" and "loss of money or property" for UCL purposes, Facebook's motion to dismiss Plaintiffs' UCL claims in the FAC should also be denied. Plaintiffs have also sufficiently alleged conduct both "unlawful" and "unfair" under the UCL.

**ISSUES TO BE DECIDED**

1.     Where the plaintiffs have adequately and specifically plead violation of their common law and statutory rights of publicity, that they were the persons affected by the alleged violation of law and that they suffered economic injury, and where in lieu of actual damages statutory remedies are available, may the Court nevertheless dismiss the action on Article III standing or "injury" grounds for apparent failure to meet standards the right of publicity law does not impose, for example that the alleged conduct be objectively outrageous, that the names and likeness of the plaintiffs have attained secondary meaning or that plaintiffs did not plead a ready market value for use of their names and likenesses to advertise?

2.     Where the overwhelming body of federal and state right of publicity authorities, and the legislative history of Section 3344, correctly read, teach that either the "common person" or the so-called "celebrity" may state a right of publicity claim, and have their day in court, based upon averments of economic injury, whether or not mental anguish is also plead, and where the plaintiffs have specifically and clearly alleged economic loss, may the Court nevertheless dismiss the action because the plaintiffs did not plead the <u>optional</u> averments of mental anguish?

3.     Where the plaintiffs have adequately plead violation of their common law and statutory rights of publicity, and where the plaintiffs have clearly and specifically plead injury and loss of property, may the Court nevertheless dismiss plaintiffs' claim under the unfair competition law?

**ARGUMENT**

**I.     WHERE A PLAINTIFF PLEADS THAT S/HE WAS DIRECTLY AFFECTED BY VIOLATION OF A RIGHT RECOGNIZED BY THE COURTS OR LEGISLATURES, EVEN RIGHTS SOUNDING IN MISAPPROPRIATION OF PERSONAL INFORMATION, DISMISSAL FOR SUPPOSED LACK OF ARTICLE III STANDING OR INJURY-IN-FACT IS NOT WARRANTED.**

Facebook claims, incorrectly, that Plaintiffs have not pled a "concrete," "distinct" or "palpable" injury to themselves, and thus lack Article III standing to bring their claims. Facebook cultivates the incorrect impression, through a string of inapposite authorities, that any claim characterized by Facebook as involving use of "personal information" is

- 4 -

categorically too ethereal, too disconnected from any recognized property right, too lacking in "economic value," to qualify for standing.  Facebook is wrong.  The courts and legislatures <u>have</u> made unlawful many types of misuse of information that could be categorized as "personal" or "private."  Facebook has simply teased out of the casebooks a few authorities regarding personal information where the theory has not previously been recognized.  In cases, such as this one, where the courts and/or legislatures <u>have</u> recognized a primary right and afforded a remedy, and where the plaintiff was personally affected by a violation of that right, even where such plaintiff has suffered relatively little or even no demonstrable loss in the marketplace, courts have rejected Article III standing and injury challenges to the assertion of such claims and permitted such plaintiffs their day in court.

A.   **Examples Abound Where Courts and Congress Have Recognized a Plaintiff's Standing to Seek Court Redress for Misuse of "Personal Information" or Invasion of "Privacy" Rights.**

The federal courts have long inferred a right of personal privacy into the Constitution, violation of which will afford an aggrieved plaintiff Article III standing, even absent an "economic injury."[1]  In this modern era of cultivation and use of potentially personal information in electronic form, Congress has repeatedly enacted laws providing civil rights and remedies for certain types of wrongdoing, violation of which affords aggrieved plaintiffs standing to petition their courts for redress.[2]  Numerous courts, including those in this

---

[1]   *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678 (1965) (state law forbidding contraceptives violated right of privacy; no discussion of any requirement that the aggrieved plaintiff suffered a demonstrable loss in the marketplace); *Carey v. Population Services, Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 2015-16 (1977) (distributors of contraceptives had standing to challenge state statute regulating distribution of contraceptives); *Hawaii Psychiatric Society v. Ariyoshi*, 481 F.Supp. 1028, 1037 (D. Hawaii 1979) (psychiatric society had Article III standing to assert privacy rights of patients in challenge to state statute permitting administrative inspection warrants to search offices of Medicaid providers).

[2]   *E.g.* Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.* (divulging contents of communications in transit to third parties); Stored Communications Act, 18 U.S.C. § 2701 *et seq.* (divulging contents of stored communications to third parties); Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* (includes prohibition on hacking into computers to obtain unauthorized access to information); Health Insurance Portability and Accountability Act of 1996, 29 U.S.C. § 1181 *et seq.* (includes regulation of use and

1    Circuit, have found sufficient injury-in-fact, and thus Article III standing, in cases involving

2    misuse of so-called "personal information" in electronic form, wherein the averred use

3    violated recognized rights arising from the Constitution, enactments of federal or state

4    legislature or rights recognized in common law.  In none of these cases did the courts find

5    that, notwithstanding averments sufficient to show violation of established law, the plaintiffs

6    nevertheless lacked Article III standing over concerns that the claimed misuse of information

7    was not sufficiently offensive, or lack of proof of a direct and specific monetary loss.[3]

8    Similar examples from other circuits abound.[4]

9

---

10   disclosure of personal medical information); Health Information Technology for Economic
11   and Clinical Health Act ("HITECH Act"), amending the Public Health Service Act, 42
     U.S.C. § 201 *et seq.* (expanding HIPAA privacy requirements and imposing new duties of
12   notification of breach and accounting for disclosure of patient health information).

13        [3] *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141-42 (9th Cir. 2010), for example,
     involved Starbucks employees whose names, addresses and social security numbers were
14   contained on a laptop stolen from Starbucks.  The plaintiffs claimed that they had enrolled in a
     free credit watch service offered by Starbucks, spent extra time monitoring accounts for
15   potential fraud and experiencing anxiety and distress due to the disclosure.  The Ninth Circuit
     rejected Starbuck's Article III challenge to plaintiff's claims, even though they had presently
16   suffered no loss from identify theft.  *See also Mayfield v U.S.*, 599 F.3d 964, 970-71 (9th Cir.
     2010) (plaintiff had suffered injury in fact, and thus had Article III standing, based upon
17   averments that the governed had obtained and retained information derived from an allegedly
     unlawful search conducted under the Foreign Intelligence Surveillance Act, even in the
18   absence of concrete proof of loss arising from actual use of the retained information); *Doe 1
     v. AOL, LLC*, 719 F.Supp.2d 1102, 1109 (N.D. Cal. 2010) (Armstrong, J.) (plaintiffs had
19   Article III standing to plead injunctive relief based upon averments that AOL had a pattern
20   and practice of storing queries containing confidential information, that AOL continued to
     collect the information objected to, that AOL had taken no steps to ensure that such
21   information would not be disclosed again and had taken no steps to retrieve the information
22   in question).

23        [4] In *Citizens for Health v. Leavitt*, 428 F.3d 167 (3d Cir. 2005), the plaintiff
24   challenged a rule providing for disclosure of patient medical information without patient
     consent under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").
25   The Third Circuit held that plaintiff had Article III standing based upon evidence that at least
     one member's medical information had or imminently would be disclosed without consent,
26   where the claimed resulting injury was avoidance of medical care to prevent further unlawful
27   disclosures and where the law afforded the plaintiff a remedy if it prevailed, namely
     restoration of the status quo prior to adoption of the challenged rule.  428 F.3d at 176 n.9.
28

Facebook cultivates its incorrect impression by teasing out of the casebooks a select handful of decisions in which a claim sounding in misuse of "personal information" was alleged, yet in which the claim was dismissed because mere collection of the type of personal information therein involved was not actionable, the defendant did not actually use the information or where the theory alleged had no recognition by any court or legislature.  Mtn. pp. 8-9. [5]  Notably, nowhere in Facebook's entire discussion of Article III, Mtn. pp. 6-11, did Facebook cite a <u>single</u> case in which a violation of the right of publicity was alleged by the person affected thereby, and yet where the court dismissed the claim on grounds of standing or injury.  To the contrary, as demonstrated in <u>Section II</u> below, the particular form of misappropriation of personal information involved here, rights of publicity, is so well

---

In *Zitovsky ex rel. Ari Z. v. Secretary of State*, 444 F.3d 614 (D.C. Cir. 2006) the court held that a three year old had Article III standing to claim violation of a statutory right under the Foreign Relations Authorization Act, Fiscal Year 2003 to have "Israel" designated on his U.S. passport as his place of birth.  The decision contains an excellent recitation of other decisions finding Article III standing in cases involving violation of statutory rights in relation to personal information.  Id. at 617-18.

[5] *E.g. In re Doubleclick Inc. Privacy Litig.*, 154 F.Supp.2d 497 (S.D.N.Y. 2001) (theories involving storage of "cookies" on computers did not fit the statutes invoked, no recognition of theory that one's "attention" or "demographic information" is property susceptible of misappropriation); *LaCourt v. Specific Media*, 2011 WL 1661532 (C.D. Cal. 2011) (another "cookie" case, no averment that the defendant had actually used the cookies to track information); *Dwyer v. American Express Co.*, 273 Ill.App.3d 742, 652 N.E.2d 1351 (1st Dist. 1995) (Illinois law did not recognize tort sounding in mere collection of cardholder names and purchasing patterns where no financial information had been disclosed); *Thompson v. Home Depot, Inc.*, 2007 WL 2746603 (S.D. Cal. 2007) (mere request to provide personal information on a form to obtain a Home Depot credit card not actionable); *In re Jet Blue Airways Corp. Privacy Litig.*, 379 F.Supp.2d 299 (E.D.N.Y. 2005) (mere harvesting and sale of certain personal information through airline's online reservation system did not violate the federal or state theories alleged); *Archer v. United Rentals, Inc.*, 195 Cal.App.4th 807, 126 Cal.Rptr.3d 118 (2011) (issue was lost money or property for UCL purposes, not Article III standing or injury, no recognition that one's address and zip codes are property rights susceptible of actionable misappropriation); *Fogelstrom v. Lamps Plus, Inc.*, 195 Cal.App.4th 986, 125 Cal.Rptr.3d 260 (2011) (same issue, zip code information not yet recognized as property susceptible of misappropriation for UCL "loss of money or property" purposes).

recognized that entire treatises are devoted to cases upholding awards in favor of plaintiffs whose rights were so violated.

> **B.** **Averments Sufficient to Demonstrate Violation of Established Legal Rights by the Person Affected Thereby Confer Standing; Facebook Has Cited No Authority Where a Violation of Law Was Alleged by the Person Affected Thereby, and Yet Where the Claim was Dismissed on Article III Standing Grounds.**

The courts have long held that injury required by Article III can exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing." *Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010), *cert. granted in part*, 2011 WL 2437037 (June 20, 2011) [6] [quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)] (plaintiffs had Article III standing where they were affected by statutory violation, but suffered no actual damages, particularly where statutory remedy was available). In such cases, the "standing question . . . is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* (quoting *Warth*, 422 U.S. at 500.) "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146 (1973).

Facebook urges wrongly that averments sufficient to show violation of a statutory right, by the person affected thereby, may nevertheless be dismissed for want of Article III standing. Facebook's argument and citations are misleading. "Standing" is a multi-faceted subject that can encompass concerns, having no application to this case, that the plaintiff was

---

[6] *See also Fulfillment Servs. v. UPS*, 528 F.3d 614, 618-19 (9th Cir 2008) ("[t]he injury required by Article III can exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing,'" freight shipping company's allegation of violation of Motor Carrier Act by which it was affected sufficient to confer standing); *L.A. Haven Hospice v. Sebelius*, 638 F.3d 644, 655-56 (9th Cir. 2011) ("It is well established that less tangible forms of injury, such as the deprivation of an individual right conferred by statute, may be sufficiently particularized and concrete to demonstrate injury-in-fact," hospice's statutory right to reimbursement for hospice care conferred standing to challenge alleged violation of statute).

not affected by the alleged violation or was not within the zone of interests protected by the statute, or that the matter is not ripe or has become moot.  *See generally* Wright Miller Cooper, "Federal Practice & Procedure" (West 3d ed. 2008) §§ 3531-3533.2.3.  Facebook has cited <u>no</u> case in which, as is the case here, a violation of statute has been alleged by the person to be protected and affected thereby, which violation is ripe and has yet to be remedied, yet in which the action was dismissed on grounds of Article III standing. Facebook's cases all involve dismissal for other unrelated standing defects.  Mtn. p. 10.[7]

## II.   PLAINTIFFS HAVE PROPERLY PLED CLAIMS FOR VIOLATIONS OF THEIR STATUTORY AND COMMON LAW RIGHTS OF PUBLICITY.

Plaintiffs have clearly and specifically plead facts meeting all of the elements of common law and statutory claims for violation right of publicity, including "injury," specifically misappropriation of property in the form of use of name and likeness to advertise, and economic loss suffered when Facebook failed to obtain consent from, and compensate, plaintiffs for their injuries.  The law, correctly read, requires no more.

### A.   The Tort in Question, Originally Conceived as a Violation of the Multi-Faceted Right of "Privacy," Also Came to be Known as the Right of "Publicity," Resulting in Economic Loss.

The tort asserted by the plaintiffs in this action has two roots.  Use of name and likeness without consent was originally suggested as an aspect of the then-unrecognized, but proposed, "right of privacy."  L. Brandeis & C. Warren, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890). The "right of privacy" attained recognition in California in early cases such as *Melvin v. Reid*, 112

---

[7] *Lee v. Chase Manhattan Bank*, 2008 WL 698482 (N.D. Cal. 2008) (unconscionability attack on arbitration clause was not ripe because plaintiff had not sought to arbitrate disputes, and thus the claimed injury was merely hypothetical); *Robins v. Spokeo, Inc.*, 2011 WL 597867 (C.D. Cal. 2011) (plaintiff speculated that future harm might occur, alleged no present harm); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601  (1979) (court <u>affirmed</u> standing of village and inhabitants to complain of alleged practice by realtors to steer homebuyers into locations based on race); *Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312 (1997) (individual members of Congress did not have sufficient personal stake to challenge constitutionality of Line Item Veto Act); *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142 (2009) (environmental organization's action involving U.S. Forest Service Regulations, some issues were moot, individual members' statements of future intentions to visit forests did not render plaintiff affected by the claimed violations).

1   Cal.App. 285, 297 P. 91 (1931), involving unwanted depiction of the plaintiff's life in film, and

2   *Fairfield v. American Photocopy Equipment Co.*, 138 Cal.App.2d 82, 86, 291 P.2d 194 (1955),

3   recognizing the vitality of the claim arising from an advertisement making the unwanted claim

4   that the plaintiff, an attorney, was a satisfied customer of the defendant photocopy equipment

5   company.  In 1960 Dean William Prosser wrote his oft-cited article, Prosser, *Privacy*, 48 Calif. L.

6   Rev. 383 (1960), the thesis of which was that the body of law known as the law of "privacy"

7   actually encompassed four distinct torts: (1) intrusion into private affairs; (2) public disclosure of

8   private facts; (3) public placement in a "false light" and (4) unpermitted appropriation of identity

9   for commercial purposes.  Under this branch of the law, in which the tort sounds in terms of

10  injuries to persons, advocates and courts became accustomed to pleading and adjudicating injuries

11  to feelings and peace of mind.

12          From these roots a separate strain emerged, referred to by courts and commentators as a

13  right of "publicity" rather than a right of "privacy."  In *Haelen Laboratories, Inc. v. Topps*

14  *Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953), involving a baseball player complaining of

15  use of his name and likeness on a chewing game card, the court held "[w]e think that in addition to

16  and independent of that right of privacy (which in New York derives from statute), a man has a

17  right in the publicity value of his photographs, i.e., the right to grant the exclusive privilege of

18  publishing his picture, . . . called a 'right of publicity.'"[8]   The "right of publicity," a property right

19  vesting in the plaintiff the exclusive control of use of identity for commercial purposes, invasion

20  of which results in economic harm, was recognized by the California courts in cases such as

21  *Lugosi v. Universal Pictures*, 25 Cal.3d 813, 160 Cal.Rptr. 323 (1979), involving commercial

22  exploitation of the Count Dracula character as portrayed by Lugosi.  The development of the

23          [8] The *Haelen* decision was followed by the seminal article, Nimmer, *The Right of*

24  *Publicity*, 19 Law & Contemp. Probs. 203 (1954).  In that article Nimmer urges that the right of

25  "publicity" should be seen not as a personal injury tort, resulting in injury to feelings, but

26  rather a form of property right, one in which the individual is vested with exclusive right to

27  grant permission to use of identity, similar to principles found in laws of patent and

28  copyright.  Nimmer anticipated the issue today before the court, whether only "celebrities"

should have a right of publicity.  Professor Nimmer concluded that "the right should be
available to everyone," and that any difference between a "celebrity" and others would be
reflected in the quantum of damages, not the availability of the right.  *Id.*

"right of publicity" as a property right, invasion of which results in economic injury, was thoroughly discussed in *Comedy III Productions, Inc. v. Saderup*, 25 Cal.4th 387, 106 Cal.Rptr. 2d 126 (2001), in which the California Supreme Court referred to the right of publicity as a form of intellectual property, not unlike copyright, and in which the court found is useful to import elements of the copyright doctrine of "fair use" when deciding whether the subject property, charcoal sketches of the "Three Stooges," were invasions of publicity rights or protected works of expression.  25 Cal.4th at 399-405.

> **B.    The "Right of Publicity," Invasion of which Results in Economic Loss, is Available to All, not Merely to "Celebrities," Even Absent any Averment of Mental Anguish.**

The vast majority of courts and commentators have concluded that any person, whether or not such person has the elusive and undefined status of "celebrity," may have their day in court based upon averments of misappropriation of the right of publicity, resulting in economic loss. Any plea that the invasion of rights resulted in mental anguish is an option, not a legal requirement to attain standing in court.  See McCarthy, *The Rights of Publicity and Privacy* (West 2011) ("McCarthy, *Rights of Publicity*") § 4:15 ("Noncelebrities – Majority view: noncelebrities have a right of publicity").[9]

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849 (1977), the only U.S. Supreme Court case on rights of publicity, is hard to square with Facebook's position. In that case Zacchini had a human cannonball act that was captured on film and replayed on television.  Zacchini sued for violation of his rights of publicity under Ohio law, on the grounds that he did not want his act broadcast without his consent.  The decision reflects no effort by Zacchini to plead mental anguish, nor any effort by either the Ohio courts or U.S. Supreme Court to discern whether Zacchini was a "celebrity."  The court held that the First Amendment did not bar Zacchini's claim to invasion of his right of publicity, the exclusive right to license reproduction of his act.  *Id.*

---

[9]  For the Court's convenience, Plaintiffs submit concurrently a Compendium of the treatises and law review articles herein cited.

The Ninth Circuit, noting the views of a number of commentators, held that the "non-celebrity" could claim misappropriation of his/her right of publicity, resulting in economic damage, in *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 824 n.11 (9th Cir. 1974):

> "[I]t is quite possible that the appropriation of the identity of a celebrity may induce humiliation, embarrassment and mental distress, while the appropriation of the identity of a relatively unknown person may result in economic injury or may itself create economic value in what was previously valueless. In this latter context, see Canessa v. J. I. Kislak, Inc., 97 N.J.Super. 327, 235 A.2d 62, 75 (1967). See also Kalven, *Privacy in Tort Law-Were Warren and Brandeis Wrong?*, 31 Law & Contemp.Prob. 326, 331 (1966); Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L.Rev. 962, 985-991 (1964)."

The ability of the non-celebrity to plead violation of rights of publicity, resulting in economic loss, was addressed in *Dora v. Frontline Video, Inc.*, 15 Cal.App.4th 536, 18 Cal.Rptr.2d 790 (1993), involving plaintiff's likeness in a surf video. Plaintiff did not plead mental anguish, but rather lack of consent to the use and non-payment. The Court of Appeal concluded it need not resolve the plaintiff's "celebrity" status – he claimed notoriety among Malibu surfing aficionados in his era – because whether or not plaintiff was a celebrity he could plead loss of the economic value of the use taken. 15 Cal.App.4th at 542 n.2.

*KNB Enterprises v. Matthews*, 78 Cal.App.4th 362, 92 Cal.Rptr.2d 713 (2000) directly refutes Facebook's erroneous contention. That case involved a claim of misappropriation of rights of publicity of a number of erotic "noncelebrity models." KNB claimed to own the models' rights of publicity by assignment. KNB made no attempt to claim that the models had experienced humiliation or mental anguish when sexually explicit photographs of them were displayed by the defendant on the Internet without authority. KNB claimed that it had the exclusive right to license display of the models' likenesses, and that defendant had infringed this right, resulting in economic loss. The court of appeal agreed, observing that "[t]he right of publicity has come to be recognized as distinct from the right of privacy." 78 Cal.App.4th at 366. "What may have originated as a concern for the right to be left alone has become a tool to control the commercial use and, thus, protect the economic value of one's name, voice, signature, photograph or likeness."

1   *Id.*  The court held that "[a]lthough the unauthorized appropriation of an obscure plaintiff's name,

2   voice, signature, photograph, or likeness would not inflict as great an economic injury as would be

3   suffered by a celebrity plaintiff, California's appropriation statute is not limited to celebrity

4   plaintiffs.  Section 3344 provides for minimum damages of $750, even if no actual damages are

5   proven."  78 Cal.App.4[th] at 368.  "Under California law, the statutory right of publicity exists for

6   celebrity and noncelebrity plaintiffs alike," 78 Cal.App.4[th] at 373 n.12.

7       *KNB* was followed in *Smith v. NBC Universal*, 524 F.Supp.2d 315, 326 n.66 (S.D.N.Y.

8   2007), involving display of a video of orca whales attacking Smith, an employee of Sea World.

9   Smith was not famous.  Smith did not claim mental anguish, but rather that he had been deprived

10  of a license fee for display of his likeness on channels owned by NBC Universal.  The district

11  court denied NBC's motion for summary judgment on Smith's Section 3344 claim, citing *KNB*,

12  and holding that Section 3344 "is not limited to celebrity plaintiffs."

13      *KNB* was followed in another case involving nude models, *Del Amo v. Baccash*, 2008 WL

14  4414514 (C.D. Cal. 2008).  Again, the plaintiffs claimed no humiliation or mental anguish from

15  unauthorized republication of their nude images.  The court found for the plaintiffs and awarded

16  statutory damages for the unauthorized use of their names and likenesses.  The court declined the

17  defendants' motion to amend the resulting judgment on the grounds that plaintiffs had failed to

18  prove physical or mental injury.  The court construed *KNB*, *Miller* and the applicable CACI

19  instructions, particularly the passages justifying an award of statutory damages even if the plaintiff

20  proved **no** actual damages, to mean that where appropriation of name and likeness to defendant's

21  advantage, without consent, is proven, injury is **presumed**.  2008 WL 4414514 *6.  *See also*

22  *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 576 (C.D. Cal. 2010) (in suit including non-

23  celebrities for use of likenesses without consent, with no claim of mental anguish, "California

24  rights of publicity clearly extend to celebrities and non-celebrities alike.")

25      Facebook's position is irreconcilable with the decision of the California Supreme Court in

26  *Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468, 97 Cal.Rptr.3d 798 (2007).  In that case Christoff, a

27  model of no particular fame, posed in 1986 for Nestle's Canada gazing into a cup of coffee.

28  Decades later Nestle redesigned the label for its "Taster's Choice" brand, which had long featured

1  the "taster," a person peering into a cup of coffee.  Nestle discovered that they lost the artwork for

2  the original "taster."  Nestle used Christoff's 1986 pose instead.  Nestle did not do so because

3  Christoff was famous, or because Nestle would enjoy an apparent endorsement from a celebrity,

4  Rather, Nestle thought Christoff looked "distinguished" and resembled the original "taster."

5  Christoff specifically denied any claim that the use was offensive, and did not assert mental

6  anguish.  Rather, he sought only compensation for the use of his image without consent.  47

7  Cal.4th at 473-74.  Christoff's case went to trial and the jury rendered a verdict in his favor.  While

8  the decision turned on the single-publication rule and its interrelation with the statute of

9  limitations, neither the Supreme Court nor the inferior courts had any difficulty that Christoff

10  denied mental distress and went to trial only on economic loss, without any finding that he was a

11  "celebrity."

12        Examination of the Judicial Council of California Civil Jury Instructions ("CACI") shows

13  that the Council has not read California's right of publicity law to distinguish between "celebrity"

14  and "non-celebrity" plaintiffs, nor has the Council fashioned instructions or verdict forms that

15  limit a "non-celebrity" plaintiff to a plea of mental anguish to have his/her day in court.  Both the

16  jury instruction on invasion of the common law right of publicity, *CACI 1803*, and violation of

17  Section 3344, *CACI 1804A*, require only a jury finding that the plaintiff suffered unspecified

18  "harm."  Neither the text of these instructions nor the use notes call for the jury to find whether the

19  plaintiff is or is not a "celebrity," nor do they call for the jury to reject the claim of a plaintiff

20  found not to be a celebrity who claims "harm" other than mental anguish.  CACI 1821,

21  concerning damages for violation of Section 3344, relates statutory damages both to the nature of

22  the injuries claimed and the degree of proof of actual damages.  The third paragraph of CACI

23  1821 states that "[h]umiliation, embarrassment and mental distress" is one of only **three**

24  categories of injury potentially claimed, the others being reputation and an open category for any

25  other nature of claimed injury.  The instruction further requires a jury to award the statutory

26  minimum of $750 if the plaintiff "has not proved" damages arising from the claimed injuries.

27  Significantly, both pattern verdict forms, VF 1803 for common law violations and VF 1804 for

28  Section 3344 violations, give the jury the **option** of awarding economic loss, loss for mental

anguish, or both.  Neither the text of the verdict forms nor the use notes indicate that the portion of the form allowing for damages for economic harm are not applicable to non-celebrity plaintiffs. None of the pattern verdict forms provide for a jury to find whether a plaintiff is or is not a "celebrity."

This Court was recently convinced of the merits of a similar standing argument in *Fraley v. Facebook*, before Judge Koh, also involving use of name and likeness by Facebook to advertise, in that case the goods and services of third parties.  In *Fraley*, a hearing before Judge Koh on Facebook's motion for protective order, because of the supposed potency of its motion to dismiss, was held on July 28, 2011.  See Transcript, Dckt. # 63.   Judge Koh rejected Facebook's meritless view that only so-called "celebrities" have standing, or suffer injury, as a result of use of their name and likeness to advertise, and accepted the view that an advertisement featuring the endorsement of a friend would have value:

> "THE COURT: . . . Let's say we said 'Justin Bieber likes,' fill in the blank.  I cannot imagine that Facebook would not have to pay Justin Bieber something to endorse anything.
> MR. BROWN [Facebook's counsel]: Yeah, well, if . . .
> THE COURT: Okay, so why should it be any different if it's my grandmother or your sister saying . . .
> MR. BROWN: Because Justin Bieber could presumably allege in a complaint that he has developed economic value in that name and likeness and he would be able to show, yes, here is the economic injury by virtue of Facebook's use of my name and likeness.
> THE COURT: Right.  But . . . all your cases that say there's no economic value say there's no economic value in my name if an advertiser wants to sell to me.
> It doesn't say that . . . my name doesn't have value to my own family and my own set of friends, who actually might take my endorsement of whatever as something because they know me.
> . . . If you're trying to hire someone in a position of trust, you would always go with the endorsement of someone you know and trust.  You would not go to a random person.
> You would not hire a nanny based upon Justin Bieber's recommendation.  You wouldn't, right?  You would go to people you trust.  So to say that that endorsement doesn't have value in this context, I have trouble with that.
> I can understand if you're just trying to sell to me.  My name may have no value if you're trying to sell to me.
> But if you are trying to sell to someone close to me who trusts my judgment and I'm endorsing it, I just have difficulty thinking that doesn't have any value."

Plaintiffs' Opposition to Facebook's Motion to Dismiss FAC – 3:10 CV 05282 RS

1   July 2, 2011 Transcript, Ex. A, 15:16-17:9, Dckt. # 63.

2       Courts in other jurisdiction are in accord that a non-celebrity has standing to claim

3   violation of publicity rights and economic loss, even in the absence of any averment of mental

4   anguish.  *See Ainsworth v. Century Supply Co.*, 295 Ill.App.3d 644, 693 N.E.2d 510, 514 (2d Dist.

5   1998) (worker in an instructional video for installing ceramic tile value of his image as used in

6   defendant's television commercial without alleging mental anguish); *Onassis v. Christian-Dior-*

7   *New York, Inc.*, 122 Misc.2d 603, 472 N.Y.S.2d 254, 260 (N.Y. Sup. 1984) ("all persons, of

8   whatever station in life, from the relatively unknown to the world famous, are to be secured

9   against rapacious commercial exploitation"); *Fanelle v. Lojack*, 2000 WL 1801270 (E.D. Pa.

10  2000) ("I am convinced that the right of publicity resides in every person, not just famous and

11  infamous individuals").

12      It would be error to dismiss this action on grounds of standing or injury, where the

13  plaintiffs have clearly and specifically plead that a property right having value was taken, over

14  skepticism that such an averment could be supported by evidence.  Plaintiffs should be given an

15  opportunity to adduce evidence of such value.  The proposition that a non-celebrity could establish

16  **<u>some</u>** value to use of name and likeness to advertise is not so preposterous as to warrant dismissal

17  on standing or injury grounds.  *See* Restatement Third, Unfair Competition § 46, comment d

18  (1995) ("the identity of even an unknown person may possess commercial value"); *Bowling v.*

19  *Missionary Servants of Most Holy Trinity*, 972 F.2d 346, 20 Media L. Rep. (BNA) 1496 (6th Cir.

20  1992) (non-celebrity three year old entitled to damages of $100 for the lost opportunity to license

21  his photo in a brochure soliciting funds for charity); *Experience Hendrix, LLC v.*

22  *Hendrixlicensing.com, Ltd.*, 766 F. Supp.2d 1122, 1131 (W.D. Wash. 2011), quoting McCarthy,

23  *Rights of Publicity* § 6.4(6)(9)  ("'[E]veryone's persona and identity has some 'commercial value'

24  during life and at the time of death.  That value may be large or small, but it cannot be said to be

25  nonexistent, no matter how 'obscure' the person."). Advertisers may pay value for use of

26  photographs that portray something that the advertiser values, such as the appearance of the coffee

27  sipping image in *Christoff,* of a person who is not famous.  *See Alberghetti v. Corbis Corp., supra*

28  (Corbis maintained photographs of some five million individuals for license, not all "celebrities").

- 16 -

1    Some courts have held that the very fact that an advertiser selected an image for

2  advertising purposes is itself evidence that use of the image for advertising purposes had value.

3  Under this view, the defendant's unjust enrichment is the plaintiff's loss.  In *Canessa v. J.I. Kislak,*

4  *Inc.*, 97 N.J. Super. 327, 235  A.2d 62, 75-76 (Law Div. 1967), the court held:

5        "[H]owever little or much plaintiff's likeness and name may be worth, defendant, who has
6        appropriated them for his commercial benefit, should be made to pay for what he has
        taken, whatever it may be worth . . . [P]laintiffs' names and likenesses belong to them.  As
7        such they are property.  They are things of value.  Defendant has made them so, for it has
        taken them for its own commercial benefit."

8
9  In *Tellado v. Time-Life Books, Inc.*, 643 F.Supp. 904, 913 (D.N.J. 1986), the court recognized

10  the rights of a Vietnam solider to recover the value of his image as used in an advertisement

11  for a book series on the Vietnam war, on the theory that the defendant wanted to use the

12  picture and should therefore pay for what it wanted to use.  The *Tellado* court relied upon the

13  recognition in *Zacchini, supra*, that the rights involved were rights of property, and the

14  analysis of commentator Kalven:

15        "The rationale for [protecting the right of publicity] is the straight-forward one of
        preventing unjust enrichment by the theft of good will. No social purpose is served by
16        having the defendant get free some aspect of the plaintiff that would have market
        value and for which he would normally pay. Kalven, *Privacy in Tort Law—Were*
17        *Warren and Brandeis Wrong?*, 31 Law & Contemp.Prob. 326, 331 (1966)."

18  In *Ainsworth, supra*, in response to the defendant's contention that the likeness of a worker laying

19  ceramic tile had no commercial value when used in defendant's advertisement, the court found:

20
21        "Century seems to advance the contention that plaintiff's image is fungible and that, by
        using plaintiff's image as opposed to any other, it received no commercial benefit. This
22        argument fares little better, for, even if we accept that plaintiff's image was a fungible
        commodity, Century nevertheless chose plaintiff's image and no other. Plaintiff's image
23        was integral to the concept of the advertisement. Century benefitted by airing the
        television commercial. Plaintiff's image, not one of the others, had some value to Century,
24        even if it were merely ease of procurement. Because Century received a commercial
        benefit from its advertising, we cannot say that Century received no benefit from the use
25        of plaintiff's image."

26  693 N.E.2d at 514-15.

27

28

C.     *Miller* **Did not Hold that Non-Celebrity Right of Publicity Plaintiffs May Obtain Standing Only by Averring Mental Anguish; its Musings Were** *Dicta,* **Based Upon Misreading of the Legislative History and Were Rendered Without Analysis or Even Mention of the Authorities Cited Herein.**

The Court, in its June 28, 2011 dismissal order, relied exclusively upon *Miller v. Collectors Universe, Inc.*, 159 Cal.App.4th 988, 72 Cal.Rptr.3d 194 (2008) for the conclusion that a "non-celebrity" plaintiff should specifically plead mental anguish.  6/28/11 Order p.9. *Miller* did **not** hold that the pleading of a non-celebrity right of publicity plaintiff claiming only economic loss must be dismissed on standing or injury grounds.  Further, the *Miller* court was presented with no question of standing or injury to decide, and this the remarks from *Miller* upon which the Court relied in its June 28, 2011 order were pure *dicta*.  *Miller's* analysis of the legislative history is demonstrably wrong.  Finally, *Miller* failed to analyze or even cite the copious authorities cited above, including controlling authority, reaching the opposite conclusion.

*Miller's* doubtful musing that the non-celebrity plaintiff would suffer "*primarily* mental harm from the commercial misappropriation of his or her name," (emphasis added), did not result in a holding that a non-celebrity plaintiff pleading only economic loss should have his/her claim dismissed at the pleading stage.  *Miller* did not involve review of a motion to dismiss, but rather of a judgment after a jury finding that the defendant had used Miller's name without consent on 14,060 certificates of authentication, which finding suggested a judgment of 14,060 times $750, the current statutory penalty for misappropriation in Section 3344(a).  The opinion does not reveal whether Miller claimed mental anguish, economic loss or both.  The jury was given CACI 1804, *supra*, which only requires a finding of "harm" of an unspecified nature, and modified versions of CACI 1821, *supra* and VF 1804, *supra*, which the jury used to conclude that Miller had been "harmed" by unauthorized use of his name 14,060 times.  159 Cal.App.4th at 993-95, 72 Cal.Rptr.3d at 198-99.  The appellate court was not faced with deciding whether the root of Miller's "harm" was mental distress or economic loss.  Rather, the only question the court of appeal actually decided was whether

1  Miller had one or multiple claims, in other words, the proper application of the "single

2  publication rule." 159 Cal.App.4th at 995-96, 72 Cal.Rptr.3d at 199-200.

3          In the passage cited in the Court's June 28, 2011 order, the appellate court mused,

4  based upon its <u>incorrect</u> reading of legislative history, that the "primary," not the "sole," right

5  protected by the statutory damage provision as applied to the non-celebrity was the right to

6  be free of mental anguish, but the court recognized that the lines between economic loss and

7  mental anguish were blurry, even recognizing that economic loss could <u>result</u> in mental

8  anguish.  159 Cal.App.4th at 1006 n.12, 72 Cal.Rptr.3d at 207 n.12.  Having mused on the

9  subject, the *Miller* court went on to say that the root of Miller's injury, whether mental or

10  economic, was not germane to the issue actually before the court, which was whether the

11  defendant had engaged in one or many "separate wrongs."  159 Cal.App.4th at 1006, 72

12  Cal.Rptr.3d at 208.  Concluding that only one wrong had been perpetrated, the appellate

13  court sent the matter back to the trial court with instructions that Miller would receive one

14  award of $750 or a new trial.  Nowhere did the *Miller* court hold that Miller had to choose

15  whether his harm was mental or economic, or that his case was to be dismissed unless he

16  plead mental harm.  159 Cal.App.4th at 1008-09, 72 Cal.Rptr.3d at 209-10.

17          Not only were the *Miller* court's musings about the likely nature of harm suffered by

18  the non-celebrity plaintiff mere *dicta*, but they were based upon a misreading of the

19  legislative history.  Plaintiffs submit concurrently a Request for Judicial Notice attaching key

20  excerpts from the legislative history culled by the Legislative Intent Service: (1) March 8,

21  1971 press release from Assemblyman John Vasconcellos announcing AB 826, his bill to

22  enact Section 3344 and specifically to provide a statutory damage, RJN Ex. 1; (2) the

23  November 10, 1971 Vasconcellos letter regarding AB 826, only partially quoted in the *Miller*

24  decision, RJN Ex. 2; (3) AB 826 (Vasconcellos) History, RJN Ex. 3; (4) Assembly Committee

25  on Judiciary analysis of AB 826, RJN Ex. 4; and (5) Senate Committee on Judiciary,

26  Background Information AB 826, RJN Ex. 5.  *FRE 201*; *Territory of Alaska v. American Can

27  Co.*, 358 U.S. 224, 226-27, 79 S.Ct. 274 276 (1959) (courts may take judicial notice of

28  legislative history of statute).  The legislative record reflects Assemblyman Vasconcellos's

concern to "establish[] a concrete remedy for the little man with a minimum of $300 payment for violation of the proposed statutory right of publicity."  RJN Ex. 2.  The law was apparently suggested over concerns, ones that anticipate the concerns expressed in this case over Facebook's behavior, about schemes in which advertisers "randomly select a person's name and use it to promote their product."  RJN Ex. 3 p. 3, *see also* RJN Ex. 5.  The legislative materials uniformly express a desire to *expand* the remedies of the "little man" whose  losses may not be susceptible of proof with evidence of prior marketplace transactions for use of name and likeness.  The November 10, 1971 Vasconcellos letter, upon which the *Miller* court relied, RJN Ex. 2, 159 Cal.App.4th at 1002, 72 Cal.Rptr.3d at 204, reflects a desire for broad application of the proposed statutory damage, makes no distinction between mental or economic damage and reflects the **opposite** of a desire to create strained distinctions between the two that would justify dismissing the "little man's" claim.  The only other "history" cited in the *Miller* opinion is a long passage from *Fairfield, supra*, a 1955 common law opinion rendered during the "right of privacy" era, barely after the first mention of a "right of publicity" as a property right and sixteen years before enactment of the statute.  *Fairfield* does nothing to illuminate the intentions of the California legislature sixteen years after the decision was rendered.  The far superior reading of the Vasconellos letter, and the legislative history as a whole, reflects the legislature's desire to afford a minimum statutory remedy for any right of publicity action filed by the "little man," with no concern for any distinction between the mental or economic nature of the harm.

Finally, *Miller*, an appellate decision, collides directly with, at a minimum, its sister appellate decisions in *KNB* and *Dora*, *supra*, and cannot survive the conclusions of the California Supreme Court in *Christoff v. Nestle, supra*, or the decision of the Ninth Circuit in *Motschenbacher, supra*.  While the Court is not obliged to follow the other state and federal decisions, pattern instructions and commentary cited herein, certainly all weigh greatly against any improvident conclusion that a non-celebrity plaintiff must have his/her case dismissed at the pleading stage because of pleading economic rather than mental loss.

**D.** **The Right of Publicity Law Imposes no Requirements that Plaintiffs Plead Secondary Meaning or the Objectively Offensive Nature of the Claimed Conduct.**

Facebook urges implicitly that the FAC must be dismissed for want of averments that would be required in a trademark claim, or a claim for invasion of privacy, but which are not required by the right of publicity law.

Facebook's repeated argument that Plaintiffs have failed to plead a ready marketplace for use of their name and likeness implicitly seeks to impose upon Plaintiffs a non-existent burden that their names and likeness have acquired "secondary meaning" from prior use in the marketplace. While that was an issue in the former Lanham Act claim, not pursued in the FAC, "secondary meaning" has not been required by the courts or the legislature to state a right of publicity claim. *See* McCarthy, *Rights of Publicity* § 5:7 (trademark law requires prior use of mark to identify goods and services, right of publicity requires no prior exploitation); *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1110 (9th Cir. 1992) (unlike right of publicity claim, Lanham Act confusion claim requires economic interest in identity akin to that of a trademark holder), Section II.B., *infra*.

Facebook also urges that use by Facebook of the likeness of one's own friend to advertise a product falls below a non-existent threshold that the challenged use of name and likeness be at least minimally offensive or important. To the contrary, no court or legislature has imported into the law of use of name and likeness any requirement, such as that present in the invasion of privacy tort, not asserted here, that the alleged conduct be highly offensive to the reasonable person. *Cf.* CACI 1800 (elements of intrusion into private affairs, 1st ¶ sub ¶ 3 requires objectively offensive conduct); CACI 1803 (elements of common law appropriation of name and likeness, offensive nature of conduct not an element); CACI 1804A (elements of violation of Section 3344, offensive nature of conduct not an element). Misappropriation of name and likeness, to be actionable, need not cause injury in a minimum sum. The cases viewing the right in question as a right of "publicity," a property right, do

- 21 -

1    not require that the use be minimally offensive, but simply without consent or compensation.

2    Nor did the legislature write any requirement of minimum offense into Section 3344.

3    **III.    PLAINTIFS HAVE ADEQUATELY PLED THE STANDING**
     **REQUIREMENTS FOR UCL CLAIMS, AS WELL AS UNDERLYING**
4    **UNLAWFUL AND UNFAIR CONDUCT.**

5    **A.    Plaintiffs Have Adequately Pled Facts Meeting the Standing**
     **Requirements of the UCL.**
6

7             Facebook contends incorrectly that Plaintiffs have not met the "more restrictive

8    standing requirements" of the UCL.  To the contrary, Plaintiffs adequately aver that they

9    have suffered "injury in fact" and have "lost money or property," *Cal. Bus. & Prof. Code §*

10   *17204.*  That Plaintiffs have pled "injury in fact" is demonstrated in Section II, *infra*.

11   Facebook cites **no** authority that the "lost money or property" requirement of Section

12   17204 must be narrowly read to refer literally to an exchange of money from the plaintiff in

13   exchange for goods or services from the defendant.  The point of Proposition 64 was to

14   eliminate UCL standing for bystanders having suffered no effect whatsoever from the

15   claimed violations, not to create narrow and technical barriers to standing for plaintiffs,

16   such as those here, who alleged that they were directly affected by the violation in

17   question.  *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 320-21, 120 Cal.Rptr.3d 741,

18   749 (2011) (citation omitted).

19            The *Kwikset* decision contradicts Facebook's argument that Plaintiffs can aver "lost

20   money or property" only through payment to Facebook of a fee for its services.  To the

21   contrary, Plaintiffs' averment that they enjoyed a property right, which was invaded by

22   Facebook without consent or compensation, a property right which was thus diminished,

23   suffices for UCL standing purposes.

24
        "There are innumerable ways in which economic injury [] may be shown.  A
25      plaintiff may (1) surrender in a transaction more, or acquire in a transaction less,
        than he or she otherwise would have; (2) have a present or future property interest
26      diminished; (3) be deprived of money or property to which he or she has a
        cognizable claim . . . ."
27

28   51 Cal.4th at 323, 120 Cal.Rptr.3d at 751.  Here, Plaintiffs have alleged misappropriation of

a property right without compensation.  These averments reflect: (1) surrender of a property right for zero, less than should have been received; (2) diminishment of a property interest; and (3) deprivation of property, for which Plaintiffs have a cognizable claim, all of which satisfy the types of "lost money or property" recognized in *Kwisket*.  See *Fields v. QSP*, 2011 WL 1375286 (C.D. Cal. 2011) (allegation of misappropriation of business plans and strategies without compensation was sufficient to show lost money or property for UCL purposes); *Brecher v. Citigroup Global Markets, Inc.*, 2011 WL 3475299 (S.D. Cal. 2011) (averments of conduct resulting in diminishment of value of restricted stock adequately pled lost money or property for UCL purposes); *Starr-Gordon v. Massachusetts Mut. Life Ins. Co.*, 2006 WL 3218778 (E.D. Cal. 2006) (allegation of wrongful termination of claim for disability benefits was sufficient allegation of lost money or property for UCL purposes).

> **B.  Plaintiffs Have Adequately Pled Unlawful Conduct Consisting of Violation of Common Law and Statutory Rights of Publicity.**

Plaintiffs have adequately pled that Facebook engaged in "unlawful" conduct, consisting of violation of Plaintiffs' common law and statutory rights of publicity.  Section II, *infra*.

> **C.  Plaintiffs Have Adequately Pled Conduct, Both "Unlawful" and "Unfair," Consisting of Deceptive Trade Practices.**

Plaintiffs have adequately alleged that Facebook has violated the UCL, both its "unlawful" and "unfair" prongs, by engaging in deceptive trade practices.

Facebook predictably claims that Plaintiffs have averred only spare conclusions to this effect.  Not so.  Plaintiffs specifically allege that the terms Facebook offers to the public promise "freedom," "ownership" and "control" – the "freedom to share" only what users *want* to share, the power to "own their information" and the power to "set privacy controls to protect [user's] choices," along with other length promises of "freedom," "ownership" and "control" over use of their own name and likeness to promote or advertise the services of Facebook or third parties.  These statements include terms of service, that

1    Facebook coins its "Statement of Rights and Responsibilities" ("SRR") and a newly

2    revised privacy statement, that Facebook coins "Controlling How You Share."   FAC ¶¶

3    77-78.  However, Facebook does not disclose any intention to utilize users' names or

4    likenesses to advertise Facebook's *own* services.  Nor does Facebook supply consumers

5    with any way in which they can manipulate privacy settings to grant or deny permission to

6    use names and likenesses in connection with either advertisements for Facebook, or for

7    goods or services of third parties.  Facebook's representations, taken together with its

8    nondisclosures and failure to deliver the promised "freedom," "ownership" and "control"

9    of name and likeness constitutes deceptive trade practices.  FAC ¶¶ 79-81.

10        The alleged practices are, at a minimum "unlawful," in that they constitute

11   violations of Section 5(a) of the Federal Trade Commission Act.  *15 U.S.C. § 45.*  The

12   conduct alleged herein is not unlike that alleged in *In the Matter of Google, Inc.*, 2011 WL

13   1321658 (F.T.C. 2011), where the FTC complained that Google's statements to the public

14   in its terms of service concerning private information in connection with its "Google Buzz"

15   application, include how users could employ settings to protect such information,

16   statements which contrasted with the manner in which such information was actually used

17   without consent and consumer's relative inability to control the information by

18   manipulating settings.

19        These alleged practices also give rise to a claim under the "unfair" prong of the

20   UCL.  Contrary to Facebook's argument, the standard to be followed for claims of

21   "unfairness" to consumers is that set forth in *See Lozano v. AT&T Wireless Servs., Inc.*, 504

22   F.3d 718, 735-36 (9th Cir. 2007), which endorses the "balancing test" of  *South Bay*

23   *Chevrolet v. GM Acceptance Corp.*, 72 Cal.App.4th 861, 85 Cal.Rptr.2d 301 (1999).

24   Under *South Bay* "[t]he 'unfair' standard . . . is intentionally broad, thus allowing courts

25   maximum discretion."  *South Bay*, 72 Cal.App.4th at 886 (citations omitted).  Simply, "the

26   court must weigh the utility of the defendant's conduct against the gravity of the harm to

27   the alleged victim."  *South Bay*, 72 Cal.App.4th at 886 (citations omitted).  The *Lozano*

28   court specifically declined to follow Facebook's authority for its multi-faceted standard,

1  *Camacho v. Auto Club of So. Cal.*, 142 Cal.App.4th 1394, 1403, 48 Cal.Rptr.3d 770 (2006).

2  504 F.3d at 746.

3           Here, the harm to consumers is significant, and Facebook's conduct has no utility.

4  Facebook has promised consumers "freedom," "ownership" and "control" over their

5  information.  Facebook has specifically promised users that they may use privacy controls

6  to grant or deny consent to use name or likeness in connection with third party

7  advertisements.  Facebook makes no disclosure that Facebook reserves the right to engage

8  in, and has engaged in, massive use of users' names and likenesses to advertise Facebook's

9  own services.  Facebook in fact does not provide users with the ability to manipulate

10  privacy settings to grant or deny permission to use name and likenesses to advertise

11  Facebook's services or those of third parties.  Facebook's misleading statements, failure to

12  afford the promised control and misappropriating conduct has little to no utility to

13  countervail the injury to consumers.  Facebook's alleged conduct is sufficiently egregious

14  that it meets even the more particular standards of *Camacho*, in the unlikely event the

15  Court concludes that *Camacho* states the standard to be followed.

16                                        **CONCLUSION**

17           Plaintiffs urge the Court to deny the instant motion.  In the unlikely event the Court

18  sees any merit in the Motion, permission to amend is requested.

19

20  Dated:  August 23, 2011              SPILLANE WEINGARTEN LLP

21                                       Jay M. Spillane
                                         Eric Carlson

22                                       INITIATIVE LEGAL GROUP APC

23                                       Marc Primo
                                         Raul Perez

24                                       Robert Byrnes

25

26

27                                       By: _____
                                               Jay M. Spillane

28                                       Attorneys for Plaintiffs and Class Members

Plaintiffs' Opposition to Facebook's Motion to Dismiss FAC – 3:10 CV 05282 RS